DIAKONIAN SOCIETY, Plaintiff-Appellant, *v.* CITY OF CHICAGO ZONING BOARD OF APPEALS *et al.*, Defendants-Appellees.

First District (5th Division)    No. 77-1630

Opinion filed August 11, 1978.

Hollobow & Taslitz, of Chicago, for appellant.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Steven G. Revethis, Assistant Corporation Counsel, of counsel), for appellees.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff appeals the trial court's affirmance of the decision of the City of Chicago Zoning Board of Appeals denying it a certificate of occupancy. It raises the following issues for review: (1) whether such decision was against the manifest weight of the evidence; and (2) whether defendants are estopped to deny the issuance of the certificate.

In August 1976, plaintiff contracted to purchase a residence for the purpose of housing 13 unrelated men. The residence is located in an area zoned for single-family dwellings; however, unrelated people may reside in parish houses, rectories, convents or monasteries as they are permitted uses. In seeking a certificate of occupancy for use of the residence in question as a monastery or convent, plaintiff communicated with the Zoning Administrator of the City of Chicago who, on September 7, 1976, gave tentative approval subject to the review by his office of plaintiff's charter and its plans and permits for the conversion of the single-family residence. On September 20, the charter was approved; however, upon application to the zoning board, the certificate of occupancy was denied with the Board finding that while the proposed occupants were members of a group bound together by religious beliefs and philosophy, their use of the residence does not constitute a rectory, parish house, monastery or convent as it more closely resembles a private club or rooming house, which is not a permitted use.

Plaintiff is a religious society which was incorporated in 1976 and which is regulated by the creeds of the Holy Catholic Apostolic Church circa 100 to 500 A.D. Since plaintiff perceives itself as an ecumenical ministry, its members may belong to and attend the services of acceptable orthodox congregations such as Roman Catholic, Lutheran, and Presbyterian. However, their day-to-day activities are regulated by the Pryor, Reverend Kemmerer, who in turn is guided by the provisions of the Benedictine Rule which was formulated by the Roman Catholic Church to administrate religious houses and monasteries. The standard schedule governing the members (plenary, postulate, and novitiate) requires arising at 5:30 a.m. for benedictions and personal devotions, eating a common breakfast, and commencing the day's work. Such work is

limited to employment and courses of study which are assigned by or found acceptable to the Pryor as being consistent with a religious profession. Seven benedictions which correspond to the daily offices of the Roman Catholic Church are required to be made throughout the day, and on holy days and feast days additional benedictions in the middle of the night are made. The members' evenings are taken up with hours of study and the performance of chores around the house. This schedule allows only four to five unregulated hours per week.

To become a plenary member, one must successfully pass through the stages of postulate and novitiate. A postulate must take simple vows of poverty, chastity and obedience which are temporary in the sense that they are revoked should the postulate fail to achieve novitiate status. Postulancy is of a year's duration and encompasses instruction in religious faith and other prescribed areas. Once the novitiate phase is entered, permanent or perpetual vows are taken with are binding for life. After nine months, a novitiate (if accepted by plaintiff) becomes a full or plenary member.

During the course of his testimony, Reverend Kemmerer defined the vows taken in the following manner:

"Poverty. The person would remit all finances that he might have or ever hope to have and he would receive a $10.00 allowance a month from which all personal effects would be drawn. That is above and beyond clothing and food which, of course, is supplied.

Chastity would mean that he would vow to pursue a celibate life unmarried.

Obedience. There would be absolute obedience to the governing body, to the rules, and to the superiors."

Father John F. Fahey, a priest of the Chicago Archdiocese of the Roman Catholic Church, was called on behalf of plaintiff as an expert witness in the area of canon law. Father Fahey testified that within the Catholic Church, a monastery is defined as the residence of monks and that a monk is one who has committed himself to a religious way of life, is a member of a religious society, has taken the vows of poverty, chastity and obedience and lives a common life with others who have taken similar vows. He testified further that he was familiar with plaintiff and that in his opinion it was a religious society and its members (except for the fact that they were not Catholic) were monks.

OPINION

Plaintiff first contends that the Board's decision is against the manifest weight of the evidence. Its position is that the letters submitted and opinions voiced during the hearing by community residents cannot properly be considered, as it was denied the opportunity to cross-examine

them and that its uncontested evidence shows their use to be a permitted one. While arguing that the comments of neighbors may in general be considered, defendants note that here such commentary is irrelevant to the legal issue involved; *i.e.*, the interpretation of the term monastery as used in the zoning ordinance. As neither party views this commentary as supportive of the judgment below, we will not consider it further. Both sides do agree, however, that the issue is one of first impression in Illinois, and they refer us to the reasoning in the strikingly similar case of *Association for Educational Development v. Hayward* (Mo. 1976), 533 S.W.2d 579.

■■ The ordinance involved here states that the following are permitted uses in single family districts: churches, rectories, parish houses, convents and monasteries. (Chicago Municipal Code, ch. 194A, art. 7, §7.3—1.) Because of the interests protected by the first amendment to the United States Constitution, the impact of zoning upon church property cannot be determined in accordance with the usual rules; however, there is no doubt that the location of church property can be regulated in a proper case. (*Twin-City Bible Church v. Zoning Board of Appeals* (1977), 50 Ill. App. 3d 924, 365 N.E.2d 1381; *South Side Move of God Church v. Zoning Board of Appeals* (1977), 47 Ill. App. 3d 723, 365 N.E.2d 118.) To interpret such a regulation, it has been said:

> "The rules governing construction of a zoning ordinance are the same as those applied in the construction of statutes. [Citations.] The basic consideration in construing an ordinance is to ascertain and then give effect to the intention of the drafters. [Citations.] To achieve this purpose, a court should focus upon the terminology used, the objects sought to be attained, the natural import of the words used in common and accepted usage, the setting in which they are employed, and the general structure of the ordinance as a whole. [Citation.] As with most zoning questions, the trial court's ruling will not be disturbed unless contrary to the manifest weight of the evidence. [Citations.]" *Pioneer Trust & Savings Bank v. County of Cook* (1977), 49 Ill. App. 3d 630, 640-41, 365 N.E.2d 913, 919. Accord, *La Salle National Bank v. The Thresholds* (1975), 27 Ill. App. 3d 635, 327 N.E.2d 22; *County of Lake v. Gateway Houses Foundation, Inc.* (1974), 19 Ill. App. 3d 318, 311 N.E.2d 371.

*Association for Educational Development v. Hayward* involved the interpretation of an ordinance almost identical to the one before us. There, an occupancy permit was denied to a group of seven unrelated males who had sought such a permit on the basis that their use of the premises constituted the permitted use of convent, monastery, rectory or parish house. The group, which is known as Opus Dei, is recognized by

the Catholic Church and included one priest and six members who have a permanent commitment to the single life and are dedicated to the practice of an intense spiritual life in the world without abandoning their own social environment or the exercise of their profession or secular occupation. These members remain laymen, as they do not take religious vows or live a community life and their activities on the premises in question were those commensurate with normal family social activities. Moreover, while intensely spiritual, the members exercise complete freedom in their choice of professional, social, political, financial, and artistic activities—being bound by no restrictions beyond those which Catholic faith and morality impose on all the faithful.

■■ The parties in *Hayward* offered dictionary definitions of the terms convent, monastery, parish house, and rectory, with evidence that down through the centuries the activities and pursuits of the occupants of such dwellings have changed to bring them in closer contact with the secular world. The Missouri Supreme Court reasoned that "the concept common to all of them in years gone by and at the present time is that the principal occupants of rectories, etc., have as their primary and regular vocation the religious life or ministry under a religious superior. None of the definitions include within their scope persons whose religious activities constitute an avocation even though their religious beliefs are intensely held and adherred [*sic*] to and their avocational activities are church related." (533 S.W.2d 579, 586.) We believe this reasoning to be sound, as we are of the opinion that parish houses, rectories, monasteries or convents in the ordinary sense of the terms were not intended to be defined in any manner other than the residences of religious professionals living a common life with each other.

■■ Here, defendants do not challenge the credibility of plaintiff's evidence; but, instead, argue that only the ordained Reverend Kemmerer is a religious professional and that the profession of the other men is the employment or course of study pursued away from the residence in question. We cannot agree, as we believe that plaintiff has established that its members were religious professionals rather than men with an intense religious avocation, as in *Hayward*. This appears from evidence that its members, whether plenary, novitiate or postulate, must take and keep vows of chastity, poverty, and obedience; that with the exception of four to five hours per week, their activities are regulated by the Benedictine Rule which was formulated to run monasteries and religious houses; that they live a common life with each other under the rule of their Pryor and are bound to make seven benedictions throughout the day; and that according to the expert on canon law called by plaintiff, the members (although not Catholic) are monks as he understands the term.

Accordingly, we are of the opinion that the decision of the trial court affirming the judgment of the Zoning Board of Appeals must be reversed as against the manifest weight of the evidence.

To facilitate future proceedings upon remand, we will consider plaintiff's other contention that the Zoning Board of Appeals was estopped to deny its certificate of occupancy.

Estoppel requires a promise unambiguous in terms, reliance on such promise by the party to whom it is made, foreseeability of such reliance by the maker, and resulting injury. (*S. M. Wilson & Co. v. Prepakt Concrete Co.* (1974), 23 Ill. App. 3d 137, 318 N.E.2d 722.) For a municipality to be estopped, there must have occurred an affirmative act on the part of the municipality which induced substantial reliance thereon by the litigant, but such act must be the act of the municipality itself (such as legislation by a city council) rather than merely the unauthorized act of a ministerial officer or a ministerial misinterpretation. *Lake Shore Riding Academy, Inc. v. Daley* (1976), 38 Ill. App. 3d 1000, 350 N.E.2d 17; *People ex rel. Satas v. City of Chicago* (1972), 5 Ill. App. 3d 109, 282 N.E.2d 739.

■■ Here, on September 7, the zoning administrator gave tentative approval contingent upon a review of plaintiff's charter and renovation plans and permits. It appears that plaintiff interpreted this to mean that the issuance of the certificate of occupancy rested exclusively upon a review of these and only these documents. Accordingly, it supplied the administrator with a copy of its charter and, after it was approved by him on September 20, it took certain steps to achieve approval of its renovation plans. It bound itself to purchase the residence for $130,000, employed an architect to prepare plans, paid a loan commitment fee of $700, and employed accountants for a fee of $2,000 to prepare its mortgage application. At the hearing, plaintiff's architect testified that the plans which he prepared and which were submitted to the zoning administrator met with all applicable building codes of the City of Chicago. Therefore, it is plaintiff's position that as the zoning administrator limited refusal of the certificate to the failure of either of two specified contingencies, approval of its charter and conformance to the building codes, and as both contingencies had been satisfied, defendants were estopped to deny the issuance of the certificate. We must disagree.

To condition the issuance of the certificate upon a review of plaintiff's charter and its renovation plans (as was allegedly done by the zoning administrator in this case) is, in our opinion, a misinterpretation of the zoning ordinance, as such documents could not possibly supply the data necessary to accurately determine whether plaintiff's use of the premises constitutes a monastery within the meaning of the zoning ordinance. We

believe this to be the type of ministerial misinterpretation upon which one relies at his peril, and we therefore cannot say that defendants were estopped to deny the issuance of the certificate on grounds revealed by documents or sources other than plaintiff's charter and renovation plans.

For the reasons stated, the judgment appealed from is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

MEJDA and WILSON, JJ., concur.