PINE TOP INSURANCE COMPANY, in liquidation, an insolvent Illinois corporation, Plaintiff,

v.

REPUBLIC WESTERN INSURANCE COMPANY, an Arizona corporation, and Bank of America National Trust and Savings Association, a California corporation, Defendants.

No. 88 C 2032.

United States District Court, N.D. Illinois, E.D.

Nov. 16, 1990.

---

278

Holly A. Harrison, James R. Stinson, Sidley & Austin, Alan R. Dolinko and Susan A. Stone, Chicago, Ill., for plaintiff.

John J. Jennings, Jr., pro hac vice, Republic Western Ins. Co.; J. Michael Low, Low & Childers, Phoenix, Ariz., Mitchell D. Raup, David M. Spector, Susan Kozik Jones, Mayer Brown & Platt, Nancy K. Linnerooth, Kathleen Hennessey, Phil C. Neal, Ralph T. Russell, and Lawrence M. Benjamin, Neal Gerber Eisenberg & Lurie, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

Plaintiff, Pine Top Insurance Company ("Pine Top"), in Liquidation, brought this action against defendants, Bank of America National Trust and Savings Association (the "Bank") and Republic Western Insurance Company ("Republic"), to recover the proceeds of allegedly preferential transfers in violation of Section 204 of the Illinois Insurance Code, Ill.Rev.Stat., ch. 73, ¶ 816(2). Both the Bank and Republic have moved for summary judgment on grounds that the transfers at issue are not voidable under Section 204. For the reasons stated in this memorandum opinion and order, the Bank's motion is granted and Republic's is denied.

## BACKGROUND

Pine Top is an insolvent Illinois-domiciled insurance corporation which is in liquidation proceedings pursuant to Article XIII of the Illinois Insurance Code (the "Insurance Code"), Ill.Rev.Stat., ch. 73, ¶¶ 799, et seq. On June 23, 1986, the Illinois Director of Insurance ("Director") filed a Verified Petition for the Rehabilitation of Pine Top. On January 16, 1987, the court made a determination that Pine Top was insolvent and entered an Order of Liquidation. Under this Order of Liquidation and under Section 193 of the Insurance Code, the Director became Liquidator of Pine Top and is charged with marshalling the assets of Pine Top's estate for the benefit of all of Pine Top's creditors.

The Director filed this federal action against Republic and the Bank under Section 204 of the Insurance Code, which authorizes the Director to recover preferential transfers which were received by creditors of an insolvent insurance company within four months preceding the filing of an initial pleading under Article XIII. The Director contends that, in connection with a series of letters of credit ("LC") transactions that took place during the statutory preference period, both Republic and the Bank received preferential transfers of Pine Top's assets.

The details of these transactions are as follows. Prior to its rehabilitation, Pine Top was engaged in the business of casualty insurance, both as a direct insurer and as a reinsurance company. Republic was one of numerous insurance companies, known as ceding companies, for which Pine Top acted as reinsurer. From time to time Pine Top was required to furnish security to secure its reinsurance obligations to the ceding companies. LCs covering reinsurance obligations are commonly required by state regulatory authorities when an insurance company is reinsured by another company that is not authorized to do business in the particular state. In the absence of such security for a reinsurer, a ceding company may suffer a penalty in the calculation of its reserves for purposes of compliance with state regulatory requirements.

By early 1986, Pine Top had unsuccessfully approached a number of financial institutions requesting credit for the issuance of LCs on Pine Top's account. At the time, Pine Top was a wholly-owned subsidiary of Greyhound Corporation ("Greyhound"), which had recently reacquired it after being owned for approximately ten months by the Whitney Group. From the end of 1984 to the end of 1985, Pine Top's stated surplus had declined from $12.6 million to $1.8 million, and it had been forced to cease writing new business in most states. Apparently, Pine Top was having difficulty obtaining credit due to its financial condition.

At some time in late January or early February, 1986, Greyhound contacted the Bank on Pine Top's behalf to request a $10,000,000 line of credit to be used for the issuance of LCs to Pine Top's reinsurance creditors. Although the Bank had dealt with Greyhound in the past, it had no previous dealings with Pine Top. The Bank's officer in charge of the Greyhound account was Robert Troutman ("Troutman"), a vice-president. Troutman was approached by officers of Greyhound who explained that Pine Top required LCs for various ceding companies for which Pine Top was a reinsurer and that, because the LCs were to replace others that had expired on Decem-

ber 31, 1985, the need for the credit was urgent. Troutman's negotiations were conducted with Edward Lake, Greyhound's treasurer, and Ronald Nelson, Greyhound's assistant treasurer.

According to Troutman's deposition, on February 7, 1986, Troutman obtained verbal approval for extending an LC line to Pine Top. On or about February 10, 1986, the Bank issued a commitment letter to Pine Top which specified that the Bank would receive three types of collateral as security for a $10 million line of credit: (1) an assignment of all of Pine Top's present and future reinsurance receivables (totaling approximately $16 million); (2) a pledge of unspecified cash or short-term investments in the amount of $6.8 million; and (3) the assignment of a $3.2 million LC which was to be issued on Greyhound's account. The value of this collateral was 250 percent of Pine Top's total indebtedness to the Bank.

The commitment letter did not specify when the collateral was to be provided; it did state, however, that the credit commitment would expire if not accepted in writing by March 18, 1986. A Security Agreement purportedly giving the Bank a security interest in Pine Top's reinsurance receivables and a Security and Investment Agreement purportedly giving the Bank a security interest in the $6.8 Million of short-term investments was executed on or about March 18, 1986 ("March 18 security agreements" or "March 18 agreements"), as was Pine Top's assignment of the proceeds of the $3.2 million LC. However, these documents were not actually delivered to the Bank until on or about April 18th. On April 22, 1986, Greyhound transferred cash in the amount of approximately $6.8 million to the Bank to be invested in short-term securities pursuant to the Security and Investment Agreement. In addition, on April 17, 1986, the Bank issued a

$3.2 million LC on Greyhound's account for the benefit of Pine Top.

Prior to this time, on February 20, 1986, the Bank received applications for ten standby LCs to be issued to certain reinsurance companies on Pine Top's behalf. On February 26th, the Bank issued several LCs, including an LC for the benefit of Republic in the amount of $969,642. When the Bank inquired about when the collateral for these LCs would be transferred, it was not given a specific date but was merely told it would be transferred as "soon as possible." (Troutman dep., Vol. I, pp. 70–82).

On June 23, 1986, Pine Top was placed into receivership proceedings in the State of Illinois. On or about June 23, 1986, Republic drew upon the Bank's previously-issued LC. The Bank paid the funds due Republic and reimbursed itself by liquidating the collateral Pine Top had transferred to it in late April. Plaintiff's present action alleges that these transactions constituted voidable preferential transfers as defined by Section 204 of the Insurance Code. Plaintiff alleges that the Bank received a direct transfer of Pine Top's assets in late April when it received collateral for the LCs. It alleges Republic received an indirect transfer of Pine Top assets when, on February 26, 1986, it received the LC from the Bank on the account of Pine Top.

## DISCUSSION

According to Section 204 of the Insurance Code, any transfer from a debtor to a creditor within four months of the filing of a complaint under the Insurance Code will be voidable if (1) the debtor had an antecedent debt to the creditor, (2) the transfer allowed the creditor to obtain a greater percentage of his debt than other creditors in the same class, and (3) the creditor had reasonable cause to believe he was receiving such a preference by way of the transfer.[1] The policy behind the statute is to

---

**1.** The text of Ill.Rev.Stat., ch. 73, ¶ 816(2), provides in pertinent part as follows:

"Any transfer of, or lien upon, any property of any company made or created within four months prior to the filing of a complaint under this article, which gives to any creditor or policyholder or enables him to obtain a greater percentage of his debt than any other creditor or policyholder in the same class, which is accepted by a creditor or policyholder having reasonable cause to believe that

prevent certain creditors from obtaining satisfaction of their claims to the detriment of other similarly-situated creditors. It is widely accepted that federal bankruptcy law is looked to by analogy in interpreting the statute. *People ex rel. Gerber v. Central Casualty Co.*, 37 Ill.2d 392, 226 N.E.2d 862 (1967); *O'Connor v. Ins. Co. of No. America*, 622 F.Supp. 611, 616 n. 4 (N.D.Ill. 1985). Under federal law, a voidable preference does not result if the transfer was part of a "substantially contemporaneous exchange" for new value. *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917).

## I. *The Bank's Motion for Summary Judgment*

■ The Bank offers two grounds for granting summary judgment in its favor. First, it argues that the transfer to it of Pine Top collateral in April of 1986 was part of a substantially contemporaneous exchange involving the Bank's issuance of a $10,000,000 line of credit to Pine Top in February of the same year. Second, the Bank argues that it did not have reasonable cause to believe that a preferential transfer as defined by Section 204 would occur by virtue of the April, 1986 transaction. The court need only consider the Bank's first argument.

■ The doctrine of substantially contemporaneous exchange was first delineated by the Supreme Court in *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), and subsequently codified in the Bankruptcy Code at 11 U.S.C. § 547(c)(1). Under the doctrine, a transfer from a debtor to a creditor within the statutory preference period cannot be voided if (1) the parties intended that the transfer be part of a contemporaneous exchange for new value given to the debtor, and (2) the transfer was, in fact, substantially contemporaneous. In the typical substantially contemporaneous exchange, Debtor's estate takes

on new value by way of a transfer from Creditor (usually a loan), while Debtor contemporaneously compensates Creditor for this new value from proceeds in the estate. Debtor's estate is not altered in the transaction—the "piece" going out is directly compensated-for by the "piece" coming in—and so the interests held in the estate by other creditors are not affected. By contrast, where Debtor's estate takes on new value without a contemporaneous transfer to Creditor, the new value simply becomes another component of the enlarged estate and must be divided among all creditors equally.

In the bankruptcy context, substantial contemporaneity is frequently defined by virtue of 11 U.S.C. § 547(e)(2)(A), which creates a ten-day grace period in which to perfect a security interest and avoid preference liability.[2] *See Pine Top Ins. Co. v. Century Indemnity Co.*, 716 F.Supp. 311, 314 (N.D.Ill.1989). Many bankruptcy decisions therefore consider a delay of more than ten days to be *prima facie* not contemporaneous. *See, e.g., In re Damon*, 34 B.R. 626, 630 (Bkrtcy.D.Kan.1983). However, the Insurance Code has no provision corresponding to § 547(e), and there is no compelling reason to apply its rigid timetable here.

The contemporaneity requirement combines two interrelated notions. Obviously, there must be such proximity in time that the transfer from Creditor to Debtor does not become incorporated into the estate, thereby making Creditor but one more of several competing claimants in the liquidation proceeding. However, the modifier "substantial" suggests the need for a certain flexibility in evaluating the proximity of the transfers from Creditor to Debtor and Debtor to Creditor. For example, in the case of a cash transaction where Debtor uses a check instead, the exchange is not *actually* contemporaneous because the

---

such a preference will occur, shall be voidable."

**2.** Section 547(e)(2)(A) provides as follows:
"(2) For purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made—

(A) intended by the debtor and the creditor to or the transferor an the transferee, if such transfer is perfected at, or within 10 days after, such time."

check is not cash. Yet, it would be absurd to conclude that the cashing of the check is a preferential payment of an antecedent debt. Accordingly, there is a line of decisions which has allowed reasonable delays in cashing, taking into account the unique factors at work in any given case. *See Engstrom v. Wiley*, 191 F.2d 684 (9th Cir. 1951); *Engelkes v. Farmers Co–Operative Co.*, 194 F.Supp. 319 (N.D.Iowa 1961).

■ Simple check transactions are far less complicated than the present case, but conceptually the point is the same. Substantial contemporaneity is not a subject for deadlines or timetables, but rather involves a number of considerations including, but not necessarily limited to, the length of and reason for the delay, the nature of the transaction, the intentions of the parties, and the possible risk of fraud. If a delayed exchange can be credibly explained, it still will be substantially contemporaneous irrespective of the lapse in time. *See, e.g., In re Arnett*, 731 F.2d 358, 361 (6th Cir.1984).

Applying this approach to the present facts, it is clear that the transaction between Pine Top and the Bank was a substantially contemporaneous exchange.[3] In the absence of facts demonstrating a nexus between the February 26 LC and the April transfers of Pine Top assets, the only way for the court to conclude that the exchange was substantially contemporaneous would be to arbitrarily decree that two months is not too long of a gap. Such an unprincipled result clearly would defeat the purposes of Section 204. However, the undisputed facts of this case demonstrate that the Bank's LC was fully secured with specific collateral by the March 18 security agreements.

The Bank's commitment letter makes clear that the Bank would not issue a line of credit to Pine Top unless the Bank was fully secured with three forms of collateral: $6.8 million in cash or short-term invest-

ments, the assignment of all of Pine Top's present and future reinsurance receivables, and the assignment of a $3.2 million LC. The parties apparently agreed upon the collateral through earlier negotiations, although the specific sources of the collateral are not identified in the Bank's letter. Written evidence of Pine Top's agreement to these terms is found in the March 18 security agreements, although these also fail to identify the specific sources of the collateral. In order for the March 18 agreements to create a valid security interest for the Bank, they must identify specific property. Ill.Rev.Stat., ch. 26, §§ 9–203 and 9–110. Clearly, they fail to do this, describing only "certain cash, securities or other property". However, under the Uniform Commercial Code, the collateral involved in a security agreement need not be described within the four corners of the document, but also may be identified through other documents involved in the transactions. *In re Amex–Protein Development Corp.*, 504 F.2d 1056, 1060 (9th Cir.1974); *In re Data Entry Service Corp.*, 81 B.R. 467, 469 (Bkrtcy.N.D.Ill.1988).

The documents involved in this transaction clearly identify the specific sources of collateral. In a letter from Pine Top's president to the Deputy Director of the Illinois Department of Insurance ("Deputy Director"), dated February 19, 1986, Pine Top identifies $10 million in 1985 federal tax credits given to it by Greyhound, of which all but $3.2 million was to be "used to collateralize a letter of credit line at the Bank of America which Greyhound helped us [Pine Top] to negotiate." This establishes the source of the $6.8 million in cash and securities. The reinsurance receivables are identified in Pine Top's quarterly statement, showing a value in September 1985 of over $16 million. As for the $3.2 million LC, this collateral was to be created by way of the Bank issuing an LC for Greyhound's account and then receiving it back

---

**3.** The Bank has alluded to a possible issue as to when Pine Top's debt to it actually accrued. *Bank's Mem.Supp.* at 12–13. While all the parties argue as if the debt began upon the issuance of the LC to Republic on February 26, 1986, the Bank half-heartedly suggests that the debt may

not have begun until Republic drew upon the LC on June 23, 1986. This is unconvincing because the Bank gave Pine Top value at the moment it issued the LC, and it is from this date that substantial contemporaneity must be measured.

from Greyhound by assignment. Although this transaction was not completed until April 17, 1986, the LC was merely a replacement for a previously existing LC in the identical amount that had been issued by the Valley National Bank of Arizona on March 31, 1985. In a letter to the Deputy Director, dated February 25, 1986, Greyhound's chief financial officer identified this preexisting LC and stated,

> "This letter of credit was provided to guarantee the collectibility of reinsurance recoverable from reinsurers of the Pine Top and is currently pledged to the Bank of America as collateral for a letter of credit line in favor of Pine Top Insurance Company.
>
> We hereby acknowledge that the letter of credit is in full force and effect and is validly exercisable as necessary."

Likewise, on the same date, Pine Top's president wrote to the Deputy Director and stated that this LC "has been pledged to the Bank of America as collateral for a letter of credit line in favor of Pine Top Insurance Company." These letters adequately identify the source of the $3.2 million LC which the Bank ultimately received from Pine Top on April 17, 1986.

The conclusion to be drawn from this evidence is that Pine Top and the Bank had an enforceable security agreement involving specific collateral not later than March 18, 1986. The delay between the Bank's issuance of the LC to Republic and the execution of this agreement was approximately three weeks. This gap, however, does not destroy the substantial contemporaneity of the exchange. It is without question that from the moment the Bank proffered its commitment letter on February 10, 1986, it intended to provide a line of credit to Pine Top *only* if it was fully secured from the outset. Pine Top's intent to contemporaneously secure the Bank is evidenced by its letters to the Deputy Director on February 19th and 25th. The transaction thereby arranged between Pine Top and the Bank, commencing in February and stumbling along until its culmination in late April, was a contemporaneous exchange for new value.

As such, the transfer of Pine Top assets to the Bank was not preferential as defined by Section 204, and so the Bank is entitled to summary judgment in its favor. Having reached this conclusion, the court need not address the Bank's other arguments in support of its motion.

## II. Republic's Motion for Summary Judgment

■ Republic has characterized its motion as one both for summary judgment and partial summary judgment,[4] although it is unclear for which counts each prayer applies. It offers three arguments in support of the motion. First, it contends that it did not have knowledge that Pine Top was insolvent at the time it accepted the transfers of Pine Top's assets from the Bank, and thus it did not have a "reasonable cause to believe" it was receiving a preference. Second, it argues that it did not have knowledge that the LC it received from the Bank was collateralized by Pine Top's assets, and thus it did not have a "reasonable cause to believe" it was receiving a preference. Finally, it argues that plaintiff is equitably estopped from asserting a preference as to the securities, in the amount of $1,388,098, withdrawn from the Republic Western Security Trust Fund.[5]

### A. The "reasonable cause to believe" prong of Section 204

■ In order for a preference to become voidable under Section 204 of the Insurance

---

**4.** Along with its motion, Republic has filed an opposition to the Bank's motion for summary judgment. Specifically, Republic contests the applicability of the doctrine of substantially contemporaneous exchange. It appears that Republic's theory of defense is that it can only be exposed to preference liability if the transfer to the Bank of Pine Top assets was substantially contemporaneous with the issuance of the LC. See *In re Compton Corp.*, 831 F.2d 586, 589 (5th Cir.1987); *In re Air Conditioning, Inc.*, 845 F.2d 293 (11th Cir.1988).

**5.** Plaintiff alleges Republic obtained a preference by way of an indirect transfer of Pine Top assets through the collateralization of the Bank's LC. The indirect transfer concept is not a new one. See *Natl. Bank of Newport v. Natl. Herkimer County Bank*, 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912).

Code, the creditor must have reasonable cause to believe that a preference will occur from a given transfer. Such knowledge is established by a showing that the creditor had reasonable cause to believe the debtor was insolvent. *Cunningham v. Brown*, 265 U.S. 1, 10–11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924). *See also Pine Top Ins. Co. v. Century Indem. Co.*, 716 F.Supp. 311, 316 (N.D.Ill.1989). "Reasonable cause to believe" is defined as actual or constructive knowledge of insolvency. *Yorke v. Thomas Iseri Produce Co.*, 418 F.2d 811, 814 (7th Cir.1969) quoting 3 *Collier on Bankruptcy* § 60.53, 1057–1058 (14th ed. 1977) (reasonable cause results where "such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor was insolvent"). This standard includes a duty of inquiry. *See In re Hygrade Envelope Corp.*, 366 F.2d 584 (2nd Cir.1966); *In re PRS Products, Inc.*, 574 F.2d 414 (8th Cir. 1978); *Green v. A.G. Edwards & Sons, Inc.*, 582 F.2d 439 (8th Cir.1978). Republic argues that it did not have such actual or constructive knowledge in this case.

### B. *Republic's alleged actual/constructive knowledge of Pine Top's insolvency*

There exists a material issue of fact on the question whether Republic had actual or constructive knowledge of Pine Top's insolvency. To begin with, there is evidence that Henry Martin ("Martin"), Republic's chief executive officer, was aware of Pine Top's weakened financial position. For example, Martin's deposition testimony indicates that as early as 1983 he contemplated the possible "bankruptcy of Pine Top Illinois" (Martin Dep., Vol. I, p. 152), and that after Greyhound reacquired Pine Top he repeatedly questioned the head of Pine Top about the company's financial condition (Martin Dep., Vol. III, pp. 396–99, 440, 412–25). In a telephone conversation on March 7, 1986, with Hussein Enan, Republic's reinsurance intermediary, Martin discussed the possibility of Pine Top going "belly up", as well as the possibility of Republic protecting itself by forcing Pine Top to give it some form of preferred creditor status. (Martin Dep., Vol. IV, pp. 524–33).

In letters to Greyhound's CEO and CFO on March 11, 1986, Martin expressed concern for Pine Top's future in light of its 1985 annual statement, which showed the company's surplus to be "at a level where today Pine Top is possibly insolvent." Indeed, Pine Top's financial statements for 1984 and 1985, which Republic had complete access to, show that its stated policyholder surplus declined from $12.6 million to $1.8 million within one year—a rate of approximately $1 million per month. The statements also show an increase in losses for the same period from $45.3 million to $60.5 million. Martin's letters also expressed concern that a delay on Greyhound's part in taking corrective action might make such action "too late". He also noted that rumors of insolvency were circulating throughout the industry, and he stated that Republic would be "gravely threatened by a Pine Top insolvency." In these letters Martin requested that Greyhound provide security to Republic for Pine Top's obligations.

A fair reading of these facts shows that there is an issue as to whether Republic had actual or constructive knowledge of Pine Top's insolvency at the time it received the LC from the Bank. Certainly, these facts might suggest that Republic was put under a duty to further inquire into Pine Top's financial condition. Republic attempts to rebut this inference by arguing that it received reassurances from Pine Top executives that the company was not insolvent. Yet, even assuming this is true, it would not firmly absolve Republic of its duty of inquiry. Republic also insists that it had received a guarantee from Greyhound that it would honor Pine Top's obligations. Republic apparently never saw any written guarantee, however, and it is not clear what efforts it made to confirm the existence of such a guarantee. (*See* Martin Dep., Vol. III, pp. 377–84, 471–472). Finally, Republic claims that a financial consultant hired by Greyhound assured it that Pine Top was not insolvent. However,

the consultant denies making this representation (Kinder Dep., pp. 41–42), and, at any rate, it would be a question of fact as to whether such a representation from a Greyhound agent would absolve Republic of its duty of inquiry.

C. *Republic's alleged knowledge that the LC from the Bank was collateralized by Pine Top assets*

■ Republic has also argued that in addition to knowledge of insolvency, plaintiff is required to prove that Republic had knowledge that the LC issued to it by the Bank was collateralized with Pine Top's assets. This is not correct. Republic is only required to know that it was drawing money on the debt owed to it by Pine Top, which cannot be disputed here. To graft onto Section 204 the additional requirement that a creditor know the precise sources backing up a LC would make Section 204 virtually unenforceable. Such a state of affairs would encourage creditors to race "to dismember the debtor during his slide into bankruptcy." *Valley Bank v. Vance*, 721 F.2d 259, 260 (9th Cir.1983). Accordingly, this argument must be rejected.

### D. *Equitable Estoppel*

On February 20, 1985, a Security Trust Fund was entered into among Pine Top, Republic, and First Interstate Bank of Arizona. The Security Trust Fund was established to secure Pine Top's obligations to Republic pursuant to a reinsurance treaty the parties had entered into effective October 1, 1981. This agreement provided that Pine Top was required to deposit within ten days of the end of each calendar quarter additional securities as may be necessary to cover its obligations. On April 21, 1986, Pine Top transferred into the trust fund securities totaling $1,388,098 in order to meet its increased obligations to Republic.

Subsequent to Pine Top being placed in rehabilitation on June 23, 1986, on July 1, 1986, counsel for Republic had a telephone conversation with Garry L. Smith ("Smith"), Chief General Counsel of the Illinois Office of the Receiver, concerning whether or not Republic could claim the securities in the trust fund to pay policy-holder claims. Allegedly in reliance upon the conversation with Smith, on July 3, 1986, Republic withdrew the securities in the trust fund. On July 7, 1986, Smith provided a written response on behalf of the Receiver allegedly confirming and affirmatively stating that Republic was within its rights in claiming the securities held by the trustee as a secured creditor. Republic argues that the Receiver's subsequent suit to recover the securities withdrawn by Republic from the fund is barred by the doctrine of equitable estoppel.

### 1. *Applicability of equitable estoppel in this case*

■ In federal bankruptcy actions, courts have generally held that equitable estoppel cannot be used to restrain a trustee's avoidance of preferential transfers. The rationale is simply that the trustee, when seeking to avoid such preferential transfers, does not assert a cause of action belonging to the debtor, but instead asserts an action in his representative capacity vis a vis the debtor's general unsecured creditors. *In re Best Pack Seafoods, Inc.*, 29 B.R. 23, 24 (Bkrtcy.D.Me.1983). In bringing such an action the trustee has taken title to the debtor's property, and no knowledge or representation on the part of the debtor is imputed to the trustee. *Id.* at 24. There is no privity between the trustee and the debtor upon which the doctrine of equitable estoppel can be asserted as a defense to the trustee's preference action. It is not surprising, therefore, that cases in which the trustee was found not subject to the defense of equitable estoppel, the determination was based upon the fact that the fraud or misrepresentation was on the part of the debtor.

Plaintiff cites no case where representations on the part of the trustee likewise were held exempt from equitable estoppel, nor is the court aware of any. Plaintiff argues instead that it would be unfair to penalize Pine Top's creditors by applying estoppel principles to the actions not of them, but of the Liquidator. To the contrary, the unfairness which estoppel is designed to prevent is that of penalizing creditors for actions taken by a debtor with

whom they have no privity. In the case of the Liquidator, of course, privity between he and the creditors exists. Therefore no injustice is done by applying equitable estoppel. Plaintiff also argues that invocation of estoppel would effectively impose on all liquidators the duty to evaluate and inform creditors of potential preference claims almost immediately upon a debtor's rehabilitation. This is not correct. Application of estoppel would merely require liquidator's to refrain from finally pronouncing the absence of preference claims until they are certain that none in fact exist.

Accordingly, the court concludes that the doctrine of equitable estoppel may be invoked in the present case.

### 2. The merits of Republic's estoppel argument

■ Republic must prove four elements to establish an equitable estoppel defense: (1) a false representation made with knowledge of its falsity; (2) the party asserting estoppel must be without knowledge of the truth of the representation or the means to make such a determination; (3) the representation must be with the intent that the party will act upon it; and (4) the party asserting estoppel must act on the representation to his detriment. *In re Maxwell*, 40 B.R. 231 (N.D.Ill.1984). Because Republic is unable to demonstrate even an *issue of fact* as to whether Smith made a false representation, its equitable estoppel argument must fail.

By Republic's own admission, the question put to Smith was whether or not Republic could claim the securities in the trust fund to pay policyholder claims. Smith's only representation was that Republic was within its rights to do so. The issue of a preference action was never brought up by Republic and never addressed by Smith. Therefore, at best, Republic can only claim that Smith's representation somehow impliedly conveyed the message that a preference action would not be forthcoming. However, representations giving rise to estoppel cannot be implied or inferred; they must be clearly stated. *Miehle Printing Press & Mfg. Co. v. Publications Corp.*, 166 F.2d 615, 618 (7th Cir.1948); *Diakonian Society v. City of Chicago Zoning Bd. of Appeals*, 63 Ill.App.3d 823, 20 Ill.Dec. 634, 380 N.E.2d 843 (1978) (promise giving rise to estoppel must be unambiguous).

Republic attempts to rely on cases holding that acts of omission or culpable negligence are sufficient to give rise to estoppel even in the absence of an affirmative representation. *See Moline I.F.C. Finance, Inc. v. Soucinek*, 91 Ill.App.2d 257, 234 N.E.2d 57 (1968); *Niazi v. St. Paul Mercury Ins. Co.*, 265 Minn. 222, 228, 121 N.W.2d 349 (1963). However, Smith would have to have been silent on the issue of preference liability in the face of at least some reference to it by Republic in its query to him. Lacking this, it stretches reason beyond permissible bounds to conclude that Smith somehow made an intentional misrepresentation by omission.

Therefore, Republic has no claim under the doctrine of equitable estoppel.

### CONCLUSION

For the foregoing reasons, the court concludes that the transfer of Pine Top assets to the Bank was part of a substantially contemporaneous exchange for new value, exempt from voidability under Section 204 of the Insurance Code. Summary judgment therefore is granted in favor of the Bank. Since there remain issues of material fact concerning plaintiff's claim against Republic, Republic's motion for summary judgment is denied.

IT IS SO ORDERED.