ASSOCIATION FOR EDUCATIONAL DEVELOPMENT, a corporation, and Rev. William Stetson, et al., as members and representatives of a class known as Opus Dei Center of St. Louis, an unincorporated association, Plaintiffs-Relators-Respondents,

v.

John L. HAYWARD et al., as members and alternate members of and comprising the Board of Adjustment of the City of Kirkwood, Defendants-Respondents-Appellants,

v.

Samuel B. MURPHY et al., Intervenors-Defendants-Appellants.

No. 58761.

Supreme Court of Missouri, En Banc.

March 8, 1976.

Stephen C. Murphy, Cook, Murphy, Lance & Mayer, St. Louis, for intervenors-defendants-appellants.

Robert L. Inman, Clayton, for defendants-respondents-appellants.

Albert A. Michenfelder, Jr., Clayton, for plaintiffs-relators-respondents.

BARDGETT, Judge.

The principal issue in this case is whether a decision by the board of adjustment of the city of Kirkwood denying an occupancy permit to a group of men who are members of a religious society and who sought to occupy an existing residence as their home in an area zoned single-family residential is violative of the free-exercise-of-religion provision of the First Amendment of the United States Constitution, the freedom-of-worship provision of Art. I, sec. 5, Missouri Constitution, and the due process clause of Art. I, sec. 10, of the Missouri Constitution.

The appeal in this case involves the construction of the United States and Missouri Constitutions; therefore, this court has jurisdiction. Art. V, sec. 3, Mo.Const., as amended 1970.

Respondent, Association for Educational Development (relator-plaintiff in circuit court) is an Illinois corporation which holds a certificate of authority as a foreign not-for-profit corporation in Missouri. Respondents, Rev. William Stetson, et al., (relators-plaintiffs in circuit court) are members and representative parties of an unincorporated association known as Opus Dei Center of St. Louis. The interest of all respondents is the same and they will therefore be referred to hereinafter as "respondents".

Appellants, John L. Hayward, et al., (defendants-respondents in circuit court) constitute the board of adjustment of the city of Kirkwood, hereinafter referred to as the "board" or "board of adjustment".

Appellants Samuel B. Murphy, et al., (intervenors-defendants in circuit court) are Kirkwood residents and neighboring property owners of the residence respondents sought a permit to occupy. These appellants opposed such occupancy before the board and in the circuit court and will be hereinafter referred to as "intervenors".

Before considering the constitutional issues, however, the court must determine whether the appeal to the board of adjustment by intervenors was premature and whether the respondents are entitled to an

occupancy permit under the provisions of the zoning ordinance.

Respondents applied to the building commissioner of the city of Kirkwood for a permit to occupy a residence at 519 N. Taylor, Kirkwood, Missouri, as a "Rectory—Parish House (Opus Dei)". The application for occupancy stated the house would be occupied by seven unrelated persons. These people consist of a priest and seven or eight laymen who are members of Opus Dei.

Respondents' statement concerning Opus Dei, its membership, purpose, activities, and the use which respondents intend to make of the Kirkwood residence is supported by the record of the hearing before the board and is as follows:

Rev. Stetson testified that Opus Dei, defined as "The Work of God" is an organization founded in 1928, recognized and legally constituted by the Roman Catholic Church and technically known as an Association of the Faithful, which is a form of religious society in the Catholic Church. Rev. Stetson, an ordained Catholic priest, a graduate lawyer and Doctor of Canon Law, is the Spiritual Director of this Opus Dei center. The laymen with whom he resides have a permanent commitment to the single life and are completely available to carry out the apostolate of Opus Dei. They live a full Christian life in their ordinary work in the world, and are dedicated to the apostolate in the practice of an intense spiritual life in the world without abandoning their own social environment or the exercise of their professional or secular occupation. In addition, they aid and organize educational activities relating to their professional work. Opus Dei is a worldwide organization with international headquarters in Rome and centers in some sixty countries. It maintains centers within each diocese with the approval and cooperation of the diocesan bishop. The purpose of Opus Dei is to give religious formation to its members and to others who freely seek it. In addition, like other religious groups, it organizes and promotes activities of an educational nature. The educational programs of this center have been held at Mary Queen of Peace Catholic Schools, and will be held at St. Peter's School in Kirkwood. The object of these classes is to help young men in furtherance of their own educational goals and to spread the Christian faith among them. Mass will be said daily at the rectory-parish house for the resident members only, and they will live in all respects a normal family-type of life, and while on occasion individual counseling will take place on the premises, as in other rectory-parish houses, this will constitute a relatively small part of the activity. Social activities will be commensurate with normal family social activities on the premises. The house is a substantial, well cared for, three-story home, and with the creation of three bedrooms on the third floor, will provide a separate bedroom for each man. A housekeeper, not residing on the premises, will attend to the physical management of the house and preparation of the meals.

Rev. Stetson made it clear in his testimony that, aside from himself, the other persons were laymen who regularly pursue lay professions and occupations and remain laymen while members of Opus Dei. He agreed that the following excerpt from the New Catholic Encyclopedia, p. 709, accurately describes Opus Dei:

"Persons from every profession and occupation belong to Opus Dei. After admission all remain laymen. They are not religious and hence do not take religious vows, wear a habit or live a community life.

"Members of Opus Dei, like all other Catholic members of the associations of the faithful, enjoy complete freedom in their professions and secular activities, social, political, financial, artistic, etc., with no restrictions other than those which Catholic faith and morality impose on all the faithful."

Rev. Stetson further testified that the rules of the Catholic Archdiocese of St. Louis provides for the residence together of

priests and laymen with the permission of the Bishop, and that permission has been granted by the highest authority of the Catholic Church.

The property at 519 N. Taylor is within the R–3 one-family-dwelling district. The zoning ordinance provides for a number of uses within the R–3 district in addition to one-family dwellings, among which are: churches and similar places of worship, and convents, monasteries, rectories or parish houses to be regularly occupied by not more than ten persons.

"Family" is defined by the ordinance as "One or more persons occupying a dwelling and living as a single housekeeping unit, all of whom or all but two of whom are related to each other by birth, adoption or marriage as distinguished from a group occupying a boarding house or hotel as herein defined."

The ordinance does not define convents, monasteries, rectories or parish houses.

The city building commissioner issued a permit to respondents for occupancy and use by them of the premises as a "Rectory-Parish House (Opus Dei)". Intervenors objected to the issuance of the occupancy permit on the ground that the use to which the property was to be put was not within the uses permitted in R–3 single-family district by filing an appeal with the board of adjustment pursuant to section 89.100, RSMo 1969, and Art. XVI of the Kirkwood zoning ordinance. The board held an evidentiary hearing on the matter and unanimously found that the proposed use of the residence did not qualify under any of the permitted uses in an R–3 district and, therefore, the building commissioner was in error in issuing the occupancy permit. The board rescinded the permit.

Respondents, being aggrieved by the decision of the board, filed their petition for review in circuit court pursuant to section 89.110 and the court issued its writ of certiorari to the board. The matter was submitted in circuit court on the pleadings and the transcript of evidence and exhibits received in the hearing before the board. No further evidence was presented. The circuit court entered judgment for respondents. No additional findings of fact or conclusions of law were made. Appellants' motion for new trial was overruled by operation of law ninety days after it was filed and this appeal followed.

■ The first question presented is whether intervenors' (adjoining property owners) appeal to the board of adjustment from the building commissioner's issuance of the permit to respondents was premature. Respondents contend the appeal was premature because the application for the permit, on its face, was clearly within the permitted uses applicable to R–3 zoning and, since respondents had not yet occupied the property, any inquiry into the possible future activities of respondents with respect to their use of the premises was speculative and beyond the power of the board.

The application for occupancy permit asserted that the use would be "Rectory—Parish House" and the premises would be occupied by seven unrelated persons, and the permit issued by the building commissioner showed on its face the premises were to be occupied and used for a rectory-parish house. Rectories and parish houses are clearly within the permitted uses of R–3 zoned property.

However, the issue is not whether a "Rectory—Parish House" is within the scope of permitted uses. It obviously is because the ordinance so provides. The real issue here is whether the actual use to be made of the premises falls within the meaning of church, rectory, parish house, convent, or monastery, or whether the use comes within the overall intent of the zoning ordinance.

The actual use intended to be made of the property in question here is not a matter of speculation. Respondents' representative, Rev. Stetson, made it quite clear that respondents would use the premises as a residence for seven or eight men. It is apparent that it was the character of the group—a religious society—which differen-

tiated this group from any other group of unrelated people and caused the building commissioner to believe that occupancy of the dwelling by respondents would be legal as a rectory or parish house, and he therefore issued the occupancy permit. It was the duty of the building commissioner to make a decision and either issue or refuse to issue the permit; but, of course, his decision could be erroneous. It is also obvious that respondents had no desire or intent to acquire the home unless it could be utilized as a residence for the group. The future use of the property by respondents was not speculative but to the contrary was very definite and certain.

This is not a case where a party has applied for and obtained an occupancy permit and thereafter the issuance of the permit is objected to on the assertion that sometime in the future the permit holder may or will change the use and thereby become in violation of the zoning ordinance.

The decision of the building commissioner here was based upon the application for the occupancy permit, the facts as he knew them, and his interpretation of the provision of the zoning ordinance relating to rectories and parish houses. Section 89.090 requires a board of adjustment to hear and decide appeals where it is alleged that there is error in any order, requirement, decision, or determination made by an administrative official (building commissioner) in the enforcement of any ordinance (zoning ordinance).

The court holds that the issuance of the occupancy permit constituted a decision or determination by the building commissioner from which an appeal to the board of adjustment was proper and was not premature.

Respondents contend the board of adjustment incorrectly construed sec. 1(A)(5) of Art. V of Ordinance No. 5085 (zoning ordinance) as not permitting the premises to be used as proposed by respondents. The provision of the ordinance referred to permits the property to be used for "Convents, monasteries, rectories or parish houses to be regularly occupied by not more than ten (10) persons". It is respondents' position that the grouping together of convents, monasteries, rectories, and parish houses creates a category of use which, when taken as a whole, includes the use respondents desire to make of the premises.

The Kirkwood zoning ordinance does not define convent, monastery, rectory, or parish house. The board of adjustment found that the use proposed by respondents did not qualify under any of the permitted uses set forth supra.

"Since the zoning ordinance is in fact a legislative exercise of the delegated police power, its wording must initially be given an 'ordinary, plain and natural' meaning [citing cases], so that the legislative intent may be ascertained. In the absence of any ambiguity, such meaning must be applied to the facts of this case". *State ex rel. Ellis v. Liddle*, 520 S.W.2d 644, 649 (Mo.App.1975).

*State ex rel. Ellis, supra,* involved the use of a single-family dwelling in Maryville, Missouri, as a foster-style-family home for six to eight unrelated boys who would live in the house under the supervision of a resident couple—husband and wife. The group of boys were under the jurisdiction of the chief juvenile officer of the fourth judicial circuit of Missouri. The house was located in an area zoned for single-family residence. The ordinance defined "dwelling" as a building designed or used for residential occupancy including single-family dwellings and group dwellings and included within the definition of family up to ten people not related by blood or marriage. The court in *State ex rel. Ellis, supra,* upheld the issuance of the occupancy permit because, inter alia, the proposed use was within the terms of definitions set forth in the ordinance.

The Kirkwood ordinance defines "family" as noted supra, and the respondents do not come within that definition because they are unrelated by blood, marriage, or

adoption. However, the Kirkwood city council, by the terms of the ordinance, did not define convents, monasteries, rectories, or parish houses. Since those terms are not defined, we must therefore look to the usual sources to ascertain their meanings and thereby determine the intent of the Kirkwood city council.

In the hearing before the board of adjustment, the parties placed in evidence the following definitions taken from Webster's Third New International Dictionary, Unabridged:

> Parish house. 1. An auxiliary building belonging to a church and used for its business, social or extension activities. 2. The residence of a Clergyman, as a Roman Catholic Priest.
>
> Rectory. 1. A benefice held by a rector; the province of a rector; a parish church, parsonage, or spiritual living, with all its rights, tithes, and glebes. 2. A rector's residence; a parsonage.
>
> Rector. 1. The ruler or governor of a country, etc. 2. A director; a leader; the chief. 3. a. Church of England. A Clergyman who has the charge and care of a parish; and has the tithes, etc.; the Clergyman of a parish where the tithes are not impropriate. b. Protestant Church. A Clergyman who is the spiritual head and, legally, the presiding officer in the parish. He is elected by the vestrymen. c. Roman Catholic Church. The head of a religious house for men. d. Roman Catholic Church. A pastor of a church or parish.
>
> Parish. a. A portion of a subdivision of a diocese committed to the spiritual jurisdiction or care of a priest or minister called Rector or Pastor.

The court has also considered the definitions of rectory, parish house, convent, and monastery as they appear in Random House Dictionary of the English Language, Unabridged Ed. 1966; Webster's Third New International Dictionary, Unabridged 1968; Black's Law Dictionary, Revised Fourth Ed. 1968; American Heritage Dictionary of the English Language 1973; and An Encyclopedia of Religion, edited by Vergilius Ferm 1959; and all are consistent with those set forth supra and infra.

Purely secular definitions of "rector" as a ruler or governor of a country, a director, leader, or chief, are not considered because the use of the terms rectory, etc., in the zoning ordinance carries a religious, not a secular, connotation.

"Religious house" is defined by Webster's and Random House dictionaries as a convent or monastery.

Random House Dictionary, *supra*, also gives the following definitions:

> *convent* 1. a community of persons devoted to religious life under a superior. 2. a society or association of monks, friars, or nuns: now usually a society of nuns. 3. the building or buildings occupied by such a society; a monastery or nunnery.
>
> *monastery* 1. a house or place of residence occupied by a community of persons, esp. monks, living in seclusion under religious vows. 2. the community of persons living in such a place. . . . Syn. 1. convent, cloister; abbey, priory.

The use of terms "convents, monasteries, rectories, or parish houses" denotes an intent on the part of Kirkwood to make the occupancy of a building in a district zoned single-family residential by more than three unrelated persons, but not more than ten, depend upon the nature and extent of the occupants' religious commitment. In the instant case, the men seeking to occupy the residence as their home have, without question, a religious commitment which arises out of their membership in a legitimate and established religious society of the Catholic Church.

The court arrives at the foregoing conclusion with respect to Kirkwood's intent because there is nothing in the zoning ordinance which gives a structural description of convents, etc. It is obvious that a structure meeting the description of a one-family dwelling, to wit, a detached building

designed for or occupied exclusively by one family and located in a one-family-dwelling district may be legitimately occupied and lived in by a group of ten or less unrelated persons *if* they are priests, ministers, rabbis, monks, or nuns, or a recognized clergyman and his family.

These titles, priests, etc., are not meant to be exhaustive but are representative examples of the class of people which obviously come within the terms of the ordinance.

If a single-family dwelling is occupied by a clergyman and his family, then that use does not require the invocation of the rectory, parish house, etc., provision of the ordinance. That use is not prohibited because the group of people constitute a family as defined in the ordinance regardless of the fact that the residence may be called a rectory. Nor is that provision, rectory, etc., of significance if the occupancy is to be by three unrelated persons, be they clergymen or laymen, because that group also qualifies as a "family" under the ordinance.

So it appears that the ordinance provision of rectory, parish house, convent, and monastery, is significant only in those situations where more than three unrelated persons seek to live in a single-family residence located in a district zoned one-family residential.

Considering the definitions of the terms used in the zoning ordinance, supra, it clearly appears that the concept common to all is that the principal residents of places called rectories, parish houses, convents, and monasteries, are people who have the religious ministry as their regular and primary vocation as distinguished from avocation. Cf. *United States v. Pompey, 445 F.2d 1313 (3d Cir. 1971); United States v. Jones*, 382 F.2d 255 (4th Cir. 1967). While there are many similarities between clergymen generally and the individual laymen of Opus Dei insofar as depth of religious conviction, prayer, and good works are concerned, nevertheless, after these similarities are acknowledged, the fact remains that the men of Opus Dei, except Rev. Stetson, are laymen and not clergymen.

Furthermore, the men of Opus Dei seeking to occupy this residence as their home do not claim to be clergymen. Their claim is that it was not the purpose or intent of the Kirkwood city council to exclude a group such as Opus Dei from using a house zoned one-family residential as their home. They support their position by the testimony of Rev. Stetson as to the religious dedication, purpose, and activities of the men of Opus Dei and by that method liken Opus Dei to religious orders in which the members' dedication and primary vocation is the religious life. Respondents also argue that the dictionary definitions of rectory, parish house, convent, and monastery, are anachronistic, being derived from (English) ecclesiastical law centuries old and no longer applicable to any Christian denomination. They argue that convents are no longer associations or communities of recluses devoted to a religious life under a superior but rather, with few exceptions, are homes for women pursuing a religious vocation who teach and carry on related activities in schools and other places close to and many miles removed from the convent. In other words, argue respondents, that because the life styles and activities of clergymen and nuns have changed from lives of seclusion and personal piety to that which includes more secular related activities, the old world concepts evidenced in the dictionary definitions no longer apply. That because the men of Opus Dei are engaged in Catholic diocesan-approved church-related activities, which include the use of the premises of St. Peter's Catholic Church for institutional purposes, and because they are totally devoted to the furtherance of the apostolate of the Catholic Church in St. Louis, the use of this house as their home is no more secular than is the use of a rectory or parish house by a group of clergymen. That the use is religious to the same extent that occupancy by nuns or a group of clergymen would be religious, this use therefore comes

within the more modern concept of a rectory, parish house, convent, or monastery.

The terms rectory, parish house, convent, and monastery, clearly connote religious use of property. The ordinance does not restrict the activities of occupants of rectories, etc., to preaching, teaching, and personal piety. But the Kirkwood city council surely had something in mind when they authorized people to utilize property zoned one-family residential as rectories, etc., and permitted up to ten unrelated persons to occupy the premises as their living quarters. The ordinance does not describe structural characteristics or the appearance of rectories, etc.; therefore, those terms could only have meaning when used to describe the occupants.

Without regard to the dictionary descriptions of the activities of occupants of rectories, etc., over the centuries, it is seen that the concept common to all of them in years gone by and at the present time is that the principal occupants of rectories, etc., have as their primary and regular *vocation* the religious life or ministry under a religious superior. None of the definitions include within their scope persons whose religious activities constitute an avocation even though their religious beliefs are intensely held and adherred to and their avocational activities are church related.

We do not believe it was the purpose or intent of the zoning ordinance to authorize the occupancy of a building in a one-family-residential district by nine unrelated laymen just because the tenth occupant is a clergyman.

The court holds that it was the purpose and intent of the rectory, parish house, monastery, and convent exception found in the one-family-residential portion of the ordinance to authorize the occupancy of a dwelling in a district zoned one-family of up to ten unrelated persons whose vocations are that of clergyman, minister, priest, rabbi or nun. In other words, it is the primary and regular vocation of the person that is

determinative of the question and not activities, etc., pursued as an avocation.

The men of Opus Dei seeking to occupy the dwelling in question do not have as their primary and regular vocation the religious ministry and therefore do not come within the purview of the rectory, etc., exception.

■ Respondents contend that the board of adjustment ruling which denied the men of Opus Dei the right to reside in the dwelling is violative of their constitutional right of freedom of religion clauses of the First Amendment of the United States Constitution, and Art. I, sec. 5, of the Missouri Constitution, and violates Art. I, sec. 10, of the Missouri Constitution, which provides "that no person shall be deprived of life, liberty or property without due process of law."

In support of their freedom-of-religion claim, respondents principally rely upon *Congregation Temple Israel v. City of Creve Coeur*, 320 S.W.2d 451 (Mo.1959). In *Temple Israel* this court held that a municipality did not have the power under section 89.020 (the municipal zoning enabling act) to exclude churches and schools from residentially-zoned districts and held invalid municipal ordinances which did so. Having decided the case in favor of Temple Israel on the ground noted supra, it was not necessary for the court to reach constitutional issues asserted by Temple Israel, although the court did cite numerous cases holding that zoning ordinances excluding churches and religious schools from residential districts were violative of constitutional provisions relating to the free exercise of religion.

Respondents argue that under the holding of *Temple Israel* a municipality cannot prohibit the location of churches and religious schools in residential districts, and that the logical conclusion under the facts of the instant case is that a city has no right to exclude members of a religious society from living in a residential district

to carry out the chosen goals of their religious society.

Intervenors and the board contend that, even if it be true that a municipality cannot constitutionally exclude churches and religious schools from a residential district, it does not follow that a city cannot validly enact a zoning ordinance which prohibits the occupancy of a house in a one-family district by more than a specified number of unrelated lay persons even though they be members of a "religious society".

The court has held supra that the ordinance in question does prohibit the use of property in a one-family-zoned district as the home of more than three unrelated persons unless those persons have as their primary and regular vocation the religious ministry. We have also held supra that the members of Opus Dei, other than Rev. Stetson, who seek to occupy the house in question as their home are not persons who have such a vocation.

The *Temple Israel* case concerned a church and religious school. The instant case involves neither and therefore *Temple Israel* is not controlling here.

In *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), six unrelated students of a college occupied a single-family residence in a one-family-dwelling district. After the owners of the residence, who had leased it to the students, were cited for violating the zoning ordinances, suit was brought in U.S. district court to have the ordinance declared unconstitutional as violative of equal protection and the rights of association, travel, and privacy. The district court upheld the ordinance and the court of appeals reversed. The United States Supreme Court reversed holding the zoning ordinance constitutional.

In *Boraas* the court stated, loc. cit. 8, 94 S.Ct. loc. cit. 1540: "It is said, however, that if two unmarried people can constitute a 'family', there is no reason why three or four may not. But every line drawn by a legislature leaves some out that might well have been included. That exercise of dis-

cretion, however, is a legislative, not a judicial, function." In *Boraas* the common tie was that the six unrelated people were all college students and the reason they desired to occupy one house was that a cooperative housing arrangement was considered by them to be pleasant, convenient, promotive of scholarly exchange, and within their pocketbooks. It was conceded that all occupants behaved in a responsible manner and no immoral conduct on their part was even suggested. Each occupied a separate bedroom. See *Boraas v. Village of Belle Terre*, 476 F.2d 806, 808 (U.S.C.A.2d Cir. 1973), for detailed facts.

In the instant case, the common tie among the laymen is their membership in Opus Dei and their reason for desiring to occupy the house in question together is that such an arrangement is conducive to the furtherance of their avocational religious activities.

The difference between *Boraas* and this case is that here the common tie is religious whereas in *Boraas* it was educational and economic. Respondents argue that this distinction is a major one because the purpose of living together here is to carry out the religious purposes of the organization—Opus Dei.

We believe it important at this point to note that the use sought to be made of this residence by respondents is not a use necessarily incidental to that of a church or parochial school so as to warrant consideration being given to respondents' claim as a right falling within the penumbra of the First Amendment rights of the free exercise of religion. It rather appears that respondents' position is that because Kirkwood specifically provided for rectories, parish houses, convents, and monasteries in one-family-dwelling districts, which rectories, etc., under the ordinance may be unconnected with any particular public church worship in another building or parochial school, the use respondents seek to make of the residence is within the penumbra of that designated in the ordinance and there-

fore a denial of that use to respondents invades their freedom-of-religion rights.

■ In order for a claimed activity to be given constitutional protection as within the penumbra of a constitutional right, it is necessary that the claimed activity be essential to the free exercise of the constitutionally protected right. That is what we believe is the essence of *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). As applied to the instant case, we do not believe the penumbra language of *Griswold* can become the basis for holding that because Kirkwood saw fit to allow a limited group of clergymen or nuns to reside in a single-family district as a group the municipality is thereby required to extend that legislatively-created right to a group of laymen.

*Palo Alto Tenants' Union v. Morgan*, 321 F.Supp. 908 (U.S.D.C.N.D.Calif.1970), affirmed 487 F.2d 883 (U.S.C.A. 9th Cir. 1973), involved a group of unrelated people exceeding in number that which was defined as a "family" in a zoning ordinance who desired to occupy a dwelling in a single-family residential district. The ordinance prohibited such occupancy and plaintiffs sought to have the ordinance declared unconstitutional on the grounds that it infringed upon their rights of freedom of association, privacy, equal protection, and due process of law.

After noting the characteristics of the traditional family as compared with the "voluntary family", the district court said at 911: "The communal living groups represented by plaintiffs share few of the above characteristics. They are voluntary, with fluctuating memberships who have no legal obligations of support or cohabitation. They are in no way subject to the State's vast body of domestic relations law. They do not have the biological links which characterize most families. Emotional ties between commune members may exist, but this is true of members of many groups. Plaintiffs are unquestionably sincere in seeking to devise and test new life-styles, but the communes they have formed are legally indistinguishable from such traditional living groups as religious communities and residence clubs. The right to form such groups may be constitutionally protected, but the right to insist that these groups live under the same roof, in any part of the city they choose, is not. To define 'association' so broadly, and to apply *Shapiro [v. Thompson]* [394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969)] so widely, would be to dilute the effectiveness of that special branch of jurisprudence which our tradition has developed to protect the truly vital interests of the citizenry."

The court upheld the ordinance and the judgment was affirmed on appeal.

The group of laymen in the instant case is legally the same as the group of people in Palo Alto Tenants Union, *supra*. The fact that the laymen in this case have as their common tie a religious motivation does not require a court to declare an ordinance which is valid as to other lay groups to be invalid as to this group of lay people. To do so would leave to a board of adjustment the authority and power to issue an occupancy permit to one group of laymen because they were acceptably religiously motivated and to deny the permit to another group of laymen which were found not to be acceptably religiously motivated, or to a group which the board determined that the religious motivation was a subterfuge.

Intervenors and the board argue that the true purpose of the rectory, its exception for groups up to ten in number, was to permit local churches to maintain auxiliary buildings for church-related activities, such as a church school, and to provide residences for their clergymen and nuns to teach in the school and to permit groups of up to ten nuns or ten priests to dwell in one building and pursue activities of seclusion and contemplation normally associated with convents and monasteries.

We deem it a matter of common knowledge that it has been traditional and cus-

tomary for nuns who teach in parochial schools to reside together in a house on or near the school or church grounds and that house is normally called a "convent", and that clergymen or priests assigned to or in charge of a parish church traditionally reside together in a house on or near the church property and that house is usually called a "rectory". The court does not say that these were the sole purposes underlying the rectory, etc., exception because that exception in the ordinance does not, by its terms, directly relate itself solely to a school or church as such. Nevertheless, this practice is so obvious and of such long standing that to ignore it would be unwarranted.

The recognition of the practice noted supra evidences that at least one of the purposes to be served by the rectory, etc., exception was the facilitation of the constitutionally-protected right of freedom of worship and the right to maintain parochial schools. As such, the limitation on the rectory, etc., exception, which is that it is available to persons whose primary and regular vocation is the religious life or ministry, is not wholly arbitrary but rather provides fixed criteria for its application.

The judgment of the circuit court is reversed and the cause is remanded with directions to enter judgment consistent with the views herein expressed which affirms the order of the board of adjustment rescinding the occupancy permit.

All of the Judges concur.