CITY OF MINNEAPOLIS, Plaintiff,

Lake Harriet Residents, Intervenors,

v.

The CHURCH UNIVERSAL AND TRI-
UMPHANT, Minneapolis/St. Paul Re-
gion, Inc., et al., Respondents.

Nos. C2–82–1333, CO–82–1542.

Supreme Court of Minnesota.

Nov. 4, 1983.

William C. Dunning, Asst. City Atty., Minneapolis, for plaintiff.

John H. Herman, James A. Payne, Minneapolis, for Intervenors.

Christopher B. Hunt, Roger A. Peterson, Peterson, Engberg, Peterson, Minneapolis, for respondents.

Owen P. Gleason, Eden Prairie, for Minnesota Civil Liberties Union, amicus curiae.

AMDAHL, Chief Justice.

This is a case of first impression. The City of Minneapolis originally commenced this zoning action in the form of a motion for a temporary injunction pursuant to Minnesota Statutes Annotated section 462.-362 (West Supp.1983) to prevent respondent Church Universal and Triumphant (Church) from using the premises at 4551–55 East Lake Harriet Parkway as a church, monastery, convent, seminary, rectory, parsonage, parish house or religious retreat. Lake Harriet Residents, an unincorporated association of residents living in the neighborhood of the Church, intervened as plaintiff.

The City alleged that the property was zoned as an RI single family residential district and that the Church was in violation of Minneapolis Code of Ordinances section 522.40 (hereinafter Code). This code section limits the occupancy of a duplex (which was the prior use of the building) to

two family units unless the premises were properly converted to other than residential use. The City also alleged the Church was in violation of Minneapolis Code of Ordinances sections 538.120 through 538.200 for not complying with the parking or loading requirements for a religious institution or church. Respondent Church replied that the Church and other accessory uses of the property were permitted under Code sections 538.120(4) and 538.120(6)(k).[1] Additionally, the Church alleged that it had substantially complied with the off-street parking and loading requirements of the Code. The trial court denied appellant's motion for a temporary injunction.[2]

The parties have all stipulated to the validity of the Church within the meaning of the Minneapolis Zoning Code and the recognition of the Church by the United States Internal Revenue Service as a tax exempt religious organization under section 501(c)(3) of the Internal Revenue Code. The issues at trial on the City's motion for a permanent injunction were limited to whether the occupancy of the Church property by more than two family units qualified as a use "accessory" to the church use and whether the Church was in violation of the parking and loading requirements of Code sections 538.120 through 538.200.[3]

After trial the court held:

(1) that the Church uses the subject property as a church, monastery and rectory;

(2) that the Church use is a permitted use and the monastery and rectory uses are permitted "accessory" uses in an RI zoned district;

(3) that the Church is in substantial compliance with the parking and loading requirements of the Code and that absolute compliance with the loading provision of the Code would create an undue burden on defendants, destroy the aesthetics of the property and produce no benefit to the surrounding property owners.

The trial court ruled that if the Church should require additional parking spaces in the future, those spaces could be located within reasonable walking distance of the subject property. The request for a permanent injunction against the Church's use of the property was denied. The City was ordered to issue all permits necessary to the recognition of the property as a permitted church, monastery and rectory. The district court, however, retained jurisdiction over any future disputes that might arise between the parties concerning the provision of additional parking spaces.

The City of Minneapolis and the intervenors, the Lake Harriet Residents, appeal from the order denying injunctive relief and the order for judgment entered in favor of the defendant Church Universal

---

**1.** The Church also claimed that the restrictions sought to be enforced by the City and the "grandfather clause" (Code sections 532.20 and 532.30) exempting from compliance churches established before July 19, 1963, when the new zoning code was adopted are unconstitutional as violations of the first and fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Minnesota Constitution. We note that such grandfather clauses have been upheld in the face of constitutional attack since 1914. *State v. Taubert,* 126 Minn. 371, 148 N.W. 281 (1914).

**2.** Intervenor also moved for a temporary injunction and both appellant and intervenor subsequently moved for summary judgment. All motions were denied.

**3.** Prior to the trial on the merits of the permanent injunction, the trial court had determined that the zoning regulations in question were constitutional on their face and as applied to churches in general. These issues were not addressed on appeal by the City, the intervenors or the Church. The Minnesota Civil Liberties Union, which participated at trial and in this appeal as Amicus Curiae, did attack the constitutionality of the ordinances. But the rule in Minnesota is that amicus curiae may not raise issues as to the constitutionality of a statutory provision when such an issue is not raised by the parties to the action. *State v. Applebaums Food Markets, Inc.,* 259 Minn. 209, 216, 106 N.W.2d 896, 901 (1960).

and Triumphant on September 15, 1982. We hereby affirm.[4]

Minneapolis Code of Ordinances section 538.120 lists the uses that are permitted in an R1, single-family residential, district. The permitted uses include:

(4) Religious institutions as follows:

(a) Churches, chapels, temples and synagogues,

\* \* \* \* \* \*

(6) Accessory uses—Incidental to and on the same zoning lot as the principal use as follows

\* \* \* (k) Convents, seminaries, monasteries and nunneries; rectories, parsonages and parish houses; religious retreats *when accessory* to a church, chapel, temple or synagogue. [emphasis added.]

Section 522.40 defines the meaning of an "accessory" building or use under the zoning code as follows:

*Accessory building or use.* A building or use which:

(1) Is subordinate to and serves the principal building or principal use,

(2) Is subordinate in area, extent or purpose to the principal building or principal use served,

(3) Contributes to the comfort, convenience *or* necessity of occupants of the principal building *or* principal use served, and

(4) Is located on the same zoning lot as the principal building or principal use

served, *with the single exception of such accessory off-street parking facilities as are permitted to locate elsewhere than on the same zoning lot with the building or use served.*

(Emphasis added). An exemplary list of accessory uses follows this definition in the Code but the list is explicitly described as not being exclusive.

The other relevant provision of the zoning ordinance is Code section 540.440, which describes the principal permitted uses of the higher density B1–1 District. This district permits all religious institutions allowed in RI districts but applies to convents, seminaries and monasteries when they are principal rather than accessory uses.

The off-street parking requirements for religious institutions and their accessory uses allowed in the R1 District are delineated in Code section 538.190 as follows:

(7) *Religious institutions.*

(a) In addition to the minimum lot area requirement and except as provided in (b) below, parking requirements shall be as follows:

(i) Ten (10) parking spaces, *or*

(ii) One parking space for each twenty (20) seats in the main auditorium plus any rooms which can be added to the main auditorium by opening of doors and/or windows so as to obtain both audio and visual unity with said main auditorium, whichever is greater.

(b) Convents, seminaries, monasteries, nunneries, rectories, parsonages, parish

4. Respondents raised the argument that the Code was enforced against this Church in particular in such a discriminatory or selective manner as to be violative of the constitutional guarantees of equal protection and freedom of religion. Church members produced evidence of 31 churches within the City of Minneapolis alleged to be in violation of the zoning ordinances but which have not been targeted for vigorous enforcement efforts. The City disputes the contention that these other churches are similarly situated in that most were grandfathered into the new code requirements and insists that when other churches have violated occupancy standards, enforcement actions have been initiated against them.

Respondents have contended that neighborhood fears about the existence of a "cult" at the Lake Harriet residence and misconceptions about the activities of Church members have prompted the City's efforts in this case. Appellants admit that some neighborhood residents have expressed such fears and misconceptions but insist that the majority of the intervenor-residents are only concerned about parking, over-occupancy and the deleterious effect upon the residential character of the neighborhood.

Since we affirm the holding of the trial court on the basis of our interpretation of the language of the zoning ordinance, we need not address the question of whether the ordinance was applied in this case in a discriminatory manner.

houses and religious retreats—Parking spaces shall be provided *in adequate number,* as determined by the zoning administrator, to serve persons employed or residing on the premises, as well as the visiting public, based on standards incorporated in the zoning code for similar uses.

(Emphasis added)

In addition, Code section 538.200 provides that religious institutions containing 10,000 square feet of gross floor area or more must provide one off-street loading berth. Section 538.90 defines a loading berth as a large parking space 10 feet wide by 25 feet in length which could accommodate a large vehicle such as a truck.

### A. Description of the Church

The Church Universal and Triumphant is a worldwide organization, founded in 1958 in Washington, D.C. by Mark L. Prophet. The Church operates a religious seminary, Summit University (established in 1973), on a 214-acre college campus in Los Angeles, California. Montessori International, a private school founded by the Church, is also located on the campus. As part of its worldwide ministry, the Church sponsors the operation of branch churches known as Church Universal and Triumphant Community Teaching Centers. The branch at 4551 East Lake Harriet Parkway is the subject of this appeal. The Church has been modeled after the early Essene and Christian communities and places great emphasis upon religious community living. Each teaching center has a religious residence directly associated with it. The Lake Harriet Teaching Center is a nonprofit corporation under the laws of the State of Minnesota.

The subject property is a large stone mansion of 17,000 square feet overlooking Lake Harriet and was used as a duplex prior to the adoption of the current zoning code. Its current zoning status is as a permissible nonconforming duplex use under the "grandfather" provision of the ordinance. The first floor of the home contains a sanctuary, public reception area, bookstore and administrative offices. These areas are used by the nonresident public members of the Church and also by the residents for private devotions, for administration and for training purposes. There are also two private residential rooms on the first floor and two garages used exclusively by the residents. On the second floor, nine rooms are private residences; there is a kitchen and dining area used primarily to prepare meals for the residents but also for communal meals for nonresidents; and a library and children's playroom used by both nonresidents and resident church members. The home contains a total of 13 bedrooms and nine baths. The basement contains storage, laundry and heating areas and an audio-visual center which also serves both residents and nonresidents.

At the time of trial there were 19 adults and three children residing at the subject property. Four of the adults were married couples. Some of the unmarried residents were male and some were female. The Church Director, Mr. Connor, testified that the number of residents could increase to 35 and that the upper limit would be imposed by the safety and health requirements of the residents. As of the date of trial, 13 former residents had left the property. Each had resided there for varying periods ranging in length from 2 to 8 months. All 13 former residents remained members of the Church. The community residential element is considered to be one of the essential elements of the mission of the Church. Residents are trained to be lay ministers. The activity of each center revolves around daily church services, prayer sessions and related church-sponsored activities.

The center conducts six public religious services per week at the subject property. In addition, prayer services are held, analogous to those held by monks or nuns in

monasteries and convents, that are not attended by the public. Daily devotions are considered a fundamental practice. Ordained ministers conduct church religious services and administer formal church sacraments. Lay ministers also serve in limited ministerial functions. Between 30 and 40 members of the Church who do not reside at the subject property routinely attend the public services.

The trial court found that persons residing at the subject property live monastic lifestyles, that is, an ordered existence, subject to specific disciplines. However, residents hold jobs or attend schools in the community and participate in community life. Thus they are not cloistered from the external world. The residents of the subject property own 10 automobiles which they use daily. Up to approximately 12 additional automobiles at a time have been parked in the vicinity by nonresident church members attending the public services.

There are currently six off-street parking spaces (including a 4-car garage) behind the building and there is room on the property for two more spaces but only by means of the removal of a great deal of landscaping.

### B. Sequence of Events

On or about June 15, 1981, members of the Church met with the Supervisor of the Minneapolis Zoning Information Office, William Nordrum, and informed him of their intention to purchase the subject property and use it as both a church and a residence for a number of "staff persons". Mr. Nordrum suggested they seek to have the property rezoned to R4-a zone in which rooming houses are permitted. Mr. Nordrum indicated that while "churches" were permitted in R1 zones, defendants would need to obtain a building permit allowing them to change the use of the subject property from a duplex to a church. Mr. Nord-

rum also indicated that the property would have to be inspected to determine floor-load adequacy and that off-street parking spaces and a loading area would have to be provided.

No mention of a monastery or rectory use of the property was made at that time. Mr. Nordrum assumed that a rooming house was to be the predominant use. Several days later Mr. Nordrum met with defendants again and completed a rezoning petition, advising defendants that the consent of two thirds of the neighboring residents within 100 feet of the church would be required for a rezoning under Minnesota Statutes Annotated section 462.357, subd. 5. (West Supp.1983).

The Church representatives then retained an attorney who advised them that churches were permitted uses in an R1 district and that monasteries were permitted accessory uses. The application for rezoning was never submitted and the property was purchased on September 15, 1981, with no rezoning contingency written into the purchase agreement.

In reaction to several complaints from neighbors and an alderman, an inspector from the City of Minneapolis Housing Department, Andrew Ellis, inspected the property on September 15, the day the Church members took occupancy, and again 3 days later. Reverend King, the director of the Church at the time, subsequently informed Mr. Ellis that the subject property was to be used as a church and was to have monastery and rectory uses as well. Nonetheless, the City within the space of less than a month issued three notices of zoning violations. The first was for overoccupancy and required that the building either be reverted back to its permitted duplex occupancy or that plans and permits be submitted to convert it. The second notice was for rubbish accumulation.[5] The third notice concerned registration of the building as a

---

5. This notice was abated on October 16, 1981. The city housing inspector admitted that the rubbish could have been left by the former

tenants who had vacated the premises on September 30, 1981. The notice was prompted by a complaint that day from a neighbor who was

let-out duplex since the City recognized the Church as the owner of the property but not as using the building itself as a church.[6] Each notice specified a 30-day period for abatement.

On October 27, 1981, a meeting was held, at the instance of respondents, between city officials and church representatives. The Church representatives agreed to retain and subsequently did retain an architect who would work with City officials to assure that the subject property would conform to safety and health regulations and to outline possible parking alternatives. Written confirmation of this fact was sent to the City by the Church attorney on October 29, 1981.

However, on October 28, 1981, Mr. Jacobs, Director of Inspections and Zoning Administrator for the City of Minneapolis wrote to the City Attorney requesting that he initiate legal proceedings against the Church.

Past practice of the zoning department has generally been to try to conciliate any disputes, to work with the subject property owners to try to conform with the Code requirements and to hold compliance orders in abeyance when the parties are willing to try to solve the problem. There is no evidence that the Church members do not intend to cooperate with the zoning officials in ensuring that their property meets the basic requirements of the Code. However, if we accept the trial judge's findings that the subject property is being used principally as a church and accessorily, as a monastery, then the notice of Code violations for overoccupancy and registration as a let-out duplex cannot stand. There are no municipal limits on the number of people allowed to attend any type of church whether traditional or nontraditional or to reside in a monastery except those limits imposed by the requirements of health and safety. The City has not alleged any such violations. The Code clearly permits both traditional and nontraditional churches alike to establish and maintain accessory monasteries and convents within an R1 district. *See* Minn. Code of Ord. §§ 538.120(4); 538.120(6)(k) (1976).

The crux of the dispute between the Church, the City and the Lake Harriet residents revolves around the interpretation of the term "monastery" as it is used in the ordinances at issue. The City argues that this court should find the teaching center does not qualify as a monastery under the Code. Alternatively the City charges that, if the building is found to be a monastery, its use is a "principal" not an "accessory" use and hence not permitted in an R1 district.

Appellants admit that the residential use of the Lake Harriet property may be a "monastic" use in sociological terms as established by three of respondents' expert witnesses at trial. But appellants contend that a different definition of "monastic" life was envisioned by the land-use planners in drafting the zoning code. Appellants wish to apply the lay and Webster's dictionary meanings of a "monastery" as a "house of religious retirement or seclusion from the world for persons under religious vows." Similarly, appellants would apply the Webster's definition of "convent" as "an association or community of *recluses* devoted to a religious life under a superior: a body of monks, friars or nuns constituting one local community * * *." The argument concludes with the assertion that the common and dictionary understanding of the term monastery would be a community characterized by privacy or solitariness, and by seclusion from the world at large. Appellants then argue that this is the meaning necessarily incorporated into the zoning code which, according to their perceptions, permits monastery uses in the most restricted residential districts only if they conform to the goals of "low population density, large yards, little traffic and close neigh-

---

attending a meeting of numerous residents and city officials.

**6.** The trial judge found that no rooms were rented to any person at the subject property.

borhood relationships." When monasteries assume a "principal" use, as opposed to a "use accessory" to a church, appellants urge, they must be placed in a B1–I zone because they place too great a burden on the residential neighborhood. The test of principal versus accessory use then becomes one of calculating the "area, extent or purpose" to which the various portions of the property are committed for the residential use relative to the area devoted to the church use.

■ Respondents quite correctly point out that the contemporary meaning of the words "monastery" and "convent" no longer necessarily indicates a reclusive lifestyle even in the most traditional and established religions. Courts in many jurisdictions have recognized that through the centuries the activities and pursuits of the occupants of convents, monasteries, parish houses and rectories have changed to bring them in closer contact with the secular world.[7] *See Diakonian Society v. City of Chicago Zoning Board of Appeals,* 20 Ill.Dec. 634, 63 Ill. App.3d 823, 380 N.E.2d 843 (1978); *Association for Educational Development v. Hayward,* 533 S.W.2d 579 (Mo.1976). The issue of whether a lay or dictionary definition as opposed to a sociological, doctrinal definition applies to the land use planners' usage of the word "monastery" is a question of law for this court. All three religious experts at trial testified and the trial court found that the residents of the Lake Harriet property live monastic lifestyles as ex-

hibited by a central religious faith, an attachment to an organized church, shared living quarters and an ordered, disciplined lifestyle. It is this definition of a monastery that we hereby adopt for interpretation of the zoning code.

■ In 1979, the Minnesota Supreme Court delineated its scope of review in zoning matters. In *Northwestern College v. City of Arden Hills,* 281 N.W.2d 865 (Minn. 1979), the court repeated that "it is our function to make an independent examination of an administrative agency's record and decision and arrive at our own conclusions as to the propriety of that determination without according any special deference to the same review conducted by the trial court." *Id.* at 868 (quoting *Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 822 (Minn.1977)). The court then declared that the same scope is appropriate in reviewing the zoning decisions of local governing bodies. *Id.* In our review of the record we conclude that the finding that the Church Universal and Triumphant Teaching Center conforms to this definition is a finding of fact which was supported by substantial evidence at trial.[8]

■ Appellants next assert that even if the use of the Lake Harriet property is characterized as "monastic" that use is still not permitted in an R1 residential neighborhood because it is a "principal" not a "subordinate" use. We disagree.

Appellants' argument that there is no "doctrinal compulsion" and no "authentic

---

**7.** The City claims that the transient nature of the residency of church members and the combination of both sexes in the same residence precludes a finding of a "monastery" use. We do not know, nor do we hazard a guess as to the typical length of time during which modern monks and nuns reside within their convents or monasteries. This question and the lack of a gender limitation upon the residents are doctrinal matters that are not determinative of the characterization of the use of the building for zoning purposes.

**8.** Prerequisites to living at the property include the following:

a. Attendance at Summit University, a Church-sponsored seminary located in California;
b. Acknowledgment of a firm belief in the teachings of the Church;
c. Completion of a detailed application;
d. Approval of the applicant by the local Church Director and the national Church Board of Trustees;
e. Execution of a vow of service by which the applicant undertakes a commitment to the Church and agrees to abide by various personal and community guidelines and disciplines; and
f. Periodic review of each member's commitment by the Church and the member.

religious necessity" for the Church and monastery to function together must fail because the zoning code incorporates no such test. The language of the Code is set forth in the disjunctive and reads very broadly; to be accessory a building or use must contribute to the comfort, convenience *or* necessity of the church. Minn.Code of Ord. § 522.40(3) (1976). There was substantial evidence at trial that the residential use served the convenience and comfort of the Church.

The Church Universal and Triumphant does not contest the evidence adduced at trial that a large and perhaps equal portion of the Lake Harriet residence is used for residential purposes. But respondent accurately points out that this Code requirement is also written in the disjunctive; to be accessory a use must also be subordinate in area, extent *or* purpose to the church use. The factual evidence at trial substantially supported the conclusion that the *purpose* of the monastery is to assist the teaching mission of the individual church.

■ The major issue then as perceived by the parties is the legal determination of which measuring rod should apply; a numerical test which counts numbers of rooms and occupants and time spent in church or monastic activities or a doctrinal test of service of purpose. The floor space, in a traditional church, that is devoted to a chapel, to church administration and to parochial school usage varies widely depending on the particular denomination and the relative maturity of the church. The same can be said for measuring the size of the congregation. Such measurements should not be determinative in deciding if a monastic or an educational or community use is an "accessory" or "principal" use. We therefore uphold the sociological, doctrinal position advanced by respondents and the trial court.

The two main cases relied on by respondents and appellant are *Havurah v. Zoning Board of Appeals,* 177 Conn. 440, 418 A.2d

82 (1979), and *Association for Educational Development v. Hayward,* 533 S.W.2d 579 (Mo.1976), respectively. In *Hayward,* several members of the Catholic Opus Dei Society were sharing a single family residence, leading an ordered life and participating in daily worship on the premises. The court held that the men were not using the residence as a monastery or church or convent because they were laymen, not clergymen; their religious ministry was an avocation rather than a "regular and primary vocation." *Hayward,* 533 S.W.2d at 585. But the Missouri court carefully distinguished this case from one involving a church which offered religious services to the public: "The *Temple Israel* case concerned a church and religious school. The instant case involves neither and therefore *Temple Israel* is not controlling here." *Id.* at 587, *citing Congregational Temple Israel v. City of Creve Coeur,* 320 S.W.2d 451 (Mo.1959). The court further stated: "We believe it is important at this point to note that the use sought to be made of this residence by respondents is not a use necessarily incidental to that of a church * * *. *Id.* at 587.

The *Havurah* court upheld the right of a synagogue located in a large residential home to provide overnight accommodations to its members during holidays when a religious ban on travel was in effect. The decision that such use constituted a permissible "accessory use" was based upon evidence adduced at trial and uncontroverted, that overnight accommodation was an essential religious practice. The trial court had found that "[c]entral to this kind of religious community is the concept of shared time, during which the members come and remain together to worship in a variety of ways, praying, studying, celebrating religious festivals, and preparing meals according to religious laws." 177 Conn. at 449, 418 A.2d at 87.

Similarly, the trial court found that the residential use of the Lake Harriet property was an "accessory" use because the occupancy of the subject property as a monas-

tery furthers the *purposes* of the Church in extending its teachings and ministry to the community. The monastery serves the *convenience* of the Church by training and screening members for future leadership.

This standard is obviously not a rigid test. But a flexible definition is in keeping with the special status that churches enjoy in our society. In a majority of jurisdictions, established churches are permitted to maintain wide-ranging uses accessory to their churches. Various parochial and community functions such as schools, playgrounds, day care centers, drug rehabilitation centers and softball fields have been found to be permitted in residential neighborhoods as accessory uses. *Havurah v. Zoning Board of Appeals,* 177 Conn. 440, 418 A.2d 82 (1979).

Moreover, the language of the ordinances at issue is very broad and evinces no intent to keep monasteries and convents that are accessory to traditional and nontraditional churches out of residential neighborhoods.

■ It is the contention of the City of Minneapolis that the Church is in violation of the Code requirements as to off-street parking and loading facilities. The evidence adduced at trial showed that the Church currently has six off-street parking spaces at its Lake Harriet property, a 4-car garage and two spaces to the north of the rear of the building. The zoning code requires that churches provide a minimum of 10 off-street parking spaces *or* "one parking space for each twenty seats in the main auditorium * * *" and one loading dock. Minn.Code of Ord. § 538.190(7)(a)(i), (ii) (1976). Currently, a maximum of 37 individuals including the residents of the property attend the Church services. There was no testimony as to the number of seats in the auditorium but we presume there is at least sufficient seating for those 37 people. The six available parking spaces therefore easily meet the Code requirements as to the number of parking spaces as well as the one loading berth required for the Church use of the property.

In the case of a newly established religious group the outside membership attending the services is likely to begin with a small number. If membership does not increase, neither will the need for more parking spaces. If membership does increase to the point where a lack of adequate parking presents a safety hazard, then the housing officials may have reason to require more parking spaces. This court, in *Minnetonka Congregation of Jehovah's Witnesses, Inc. v. Svee,* 303 Minn. 79, 85, 226 N.W.2d 306, 309 (1975), declared that "[i]t is self-evident that any church will cause heavier vehicular traffic, but for that matter, so would residential construction. However, that is far from the creation of a traffic hazard."

■ Code section 538.190(7)(b) states that additional parking spaces may be required for the "monastery" use of the property in an adequate number. This determination is left to the discretion of the zoning administrator but has apparently never been made. Nor did the appellants wait, before bringing suit, for the report of the respondent's architect as to how additional parking could be provided. Intervenors state that 7 to 12 additional spaces must be provided to accommodate the residential use. Mr. Nordrum testified that it would be departmental practice to require one parking space per three persons based on the maximum occupancy potential of the building. But Mr. Nordrum was referring to the zoning code requirements for rooming houses. The applicable Code section 538.190(7)(b) requires reference to "standards incorporated in the zoning code for *similar* use." (Emphasis added). While the residential use of the property may resemble that of dormatories or rooming houses, the special constitutional implications invoked when a monastery is "accessory" to a church, demand that only religious uses be termed "similar" uses in calculating parking space requirements.

We agree with the trial court that respondents are currently in substantial compliance with the parking requirements. The trial judge viewed the property and

found that "absolute compliance would create an undue burden on defendants, destroy the aesthetics of the property and produce no benefit to the surrounding property owners." Evidence adduced at trial supported these findings. Moreover, the City has not required absolute compliance by other churches and their accessory uses. The City's Zoning Administrator testified that the zoning code is not rigidly but is flexibly applied.

The zoning administrator should proceed to determine the maximum occupancy potential of the monastery and the number of parking spaces necessary in the interest of safety but with the flexibility that is usually applied to such cases.[9] We note that the Code itself allows accessory off-street parking facilities to be located "elsewhere than on the same zoning lot with the building or use served." Minn.Code of Ord. § 522.40(4) (1976).

This approach is consistent with the approach taken by the majority of jurisdictions which hold that zoning ordinances traditionally and expressly have included churches in residential districts in order to serve the convenience of the residents and in furtherance of the public morals and general welfare. 2 A. Rathkopf, The Law of Zoning and Planning, § 20.01 (1978 Supp.). Facilities for religious uses cannot be excluded from any residential district nor can their application for permits to expand or modify the facilities be denied unless the City proves that such exclusion or denial is a necessary exercise of the police power in furtherance of the public health, safety and general welfare. The City has to show that the need for compliance outweighs the public policy against such re-

striction upon freedom of worship and public assembly. *Jewish Reconstructionist Synagogue v. Incorporated Village,* 38 N.Y.2d 283, 379 N.Y.S.2d 747, 342 N.E.2d 534 (1975), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976).

These majority jurisdictions also hold that since a church cannot be legally excluded from a residential district by a zoning ordinance, the same result cannot legally be accomplished by denying special use permits [10] unless the zoning officials meet their burden of proof as to the existence of hazards to health, safety, morals or general welfare. Traffic congestion and increased hazards, insufficient off-street parking space, and insufficient lot size for the intended purposes have all been repudiated as grounds for denial of a permit in the majority of states because there was insufficient proof that congestion would be so extreme that extraordinary and unusual danger of accidents would result. 2 A. Rathkopf, The Law of Zoning and Planning, § 20.01 at 20–15 (4th ed. 1975).

These caveats should be carefully considered in any future disputes which may arise between the parties concerning the provision of any additional parking spaces. We agree that the trial court should retain jurisdiction as to this matter. Respondent Church must apply for a permit to change the use of the property from a nonconforming duplex use, to use as a church, monastery and rectory and the City shall issue such permit if the premises meets the fire and other safety code requirements.

Affirmed.

---

9. This does not mean that respondents do not have to comply with the City's building regulations governing load capacity, fire safety, and restroom facilities.

10. The procedural posture of this case is not the typically seen review of a denial of a special use permit. Indeed, this is the first time the City of Minneapolis has ever brought an injunctive action to enforce the zoning code. But the

granting of an injunction preventing the Church from using the subject property as a monastery would be tantamount to the denial of such a permit. Since the neighboring residents have intervened in this action, there is obviously no chance that the Church Universal and Triumphant could obtain the requisite two-thirds approval of a zoning change as is required by Minn.Stat. § 462.357(5).